DELAWARE, L. & W. R. CO. et al. v. INTERSTATE COMMERCE COMMISSION et al.

(Circuit Court, S. D. New York.  November 27, 1908.)

CARRIERS (§ 32*) — INTERSTATE COMMERCE — CAR LOAD RATES—CLASSIFICATION RULES—VALIDITY.

Official Classification, rule 5b, note, providing that car load rates shall apply to cars loaded with different packages intended for different consignees only when the consignor or consignee is the actual owner of the property, and rule 15c, declaring that shipments of property combined into packages by forwarding agents claiming to act as consignors will only be accepted when the names of individual consignors and consignees, as well as the character and contents of each package, are declared to the forwarding railroad agent, when the property will be waybilled as separate shipments and freight charged accordingly, are reasonable and valid, and are not violative of Interstate Commerce Act, Feb. 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), prohibiting discrimination, and requiring equal charges to all for the same or like and contemporaneous service; there being a substantial dissimilarity of circumstances and conditions relating to the matter of carriage of car load freight assembled by forwarding agents and the transportation of car load freight, though made up of shipments to various consignees, where the consignor or consignee is the owner of the property.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

In Equity.

The following is the report of the Interstate Commerce Commission, including the dissenting opinion of Commissioners Knapp and Harlan, sustained by the Circuit Court:

LANE, Commissioner.  The complainant is a corporation, engaged in the business of forwarding agent and of customhouse broker at Chicago and New York City.  Defendants are common carriers, engaged in the transportation of passengers and property by railroad between points in the state of Illinois and points in the state of New York, and are subject to the provisions of the act to regulate commerce as amended.  The Official Classification, to which the several defendants in these cases are parties, contains certain rules which define and limit the circumstances and conditions under which shipments shall be entitled to car load rates.  These rules have been continuously in force since a time prior to the shipments which form the bases for these complaints, and are as follows:

Rule 5b:

"In order to entitle a shipment to the car load rate, the quantity of freight requisite under the rules to secure such car load rate must be delivered at one forwarding station, in one working day, by one consignor, consigned to one consignee and destination, except that when freight is loaded in cars by consignor it will be subject to the car service rules and charges of the forwarding railroad" (see note).

"Railroad agents at forwarding points will not sign shipping receipts bearing the notation 'part car load lot' until shipping receipts for the whole car load have been presented and the freight received, in order that bill of lading may be obtained at the car load rate.  Only one original bill of lading for the whole car load shall be issued (see note).

"Railroad agents at forwarding points will not receive property in car loads for distribution by railroad agents to two or more parties; delivering agents will deliver property only to consignee thereof or to the party presenting consignee's written order, and will not recognize orders from consignor or consignee providing for distribution of car load shipments among various consignees or calling for split deliveries according to brands, marks, sizes, or other identification of packages, nor will railroad agents at delivering points

in any way act as the representative of the consignor or consignee for the distribution of car load shipments (see note).

"Note.—Rule 5b will apply only when the consignor or consignee is the actual owner of the property."

Rule 15e:

"Shipments of property combined into packages by forwarding agents claiming to act as consignors will only be accepted when the names of individual consignors and final consignees, as well as the character and contents of each package, are declared to the forwarding railroad agent, and such property will be waybilled as separate shipments and freight charged accordingly (see note).

"Note.—The term 'forwarding agents' referred to in this rule shall be construed to mean agents of actual consignors of the property, or any party interested in the combination of l. c. l. shipments of articles from several consignors at point of origin."

The complaint in No. 1,228 is based upon a shipment delivered by the complainant to the Wabash Railroad Company at its station in Chicago on or about April 23, 1907, for transportation to New York, routed via the Delaware, Lackawanna & Western Railroad. The shipment consisted of 169 packages of merchandise of various ownership, aggregating 21,813 pounds in weight, assembled by the complainant before delivery to the carrier. The bill of lading showed the Export Shipping Company as consignor and the Export Shipping Company, 9 Broadway, New York, as consignee. On arrival of the goods in New York the Delaware, Lackawanna & Western Railroad Company refused to apply its car load rate, but, in accordance with the note to rule 5b and rule 15e assessed its less than car load rates. This resulted in the collection of a total charge of $95.08, or $23.08 in excess of the charges which would have been paid if the car load rate had been applied.

The complaint in No. 1,229 is based upon a shipment delivered by the complainant to the New York, Chicago & St. Louis Railroad Company at its station in Chicago, on or about June 22, 1907, for transportation to New York, routed via the Delaware, Lackawanna & Western Railroad. The shipment consisted of 108 packages of merchandise of various ownership, aggregating 25,605 pounds in weight, assembled by the complainant before delivery to the carrier. The bill of lading showed E. Goldman & Co. as consignor and E. Goldman & Co. as consignee, "notify F. G. Bailey, Broadway, New York." On arrival of the goods in New York the Delaware, Lackawanna & Western Railroad Company refused to apply its car load rate, but, in accordance with the note to rule 5b and rule 15e, assessed its less than car load rates. This resulted in the collection of a total charge of $155.60, or $65.60 in excess of the charges which would have been paid if the car load rate had been applied.

The complaint in No. 1,230 is based upon a shipment delivered by the complainant to the Baltimore & Ohio Railroad Company at its station in Chicago on or about May 9, 1907, for transportation to New York, routed via the Baltimore & Ohio Railroad. The shipment consisted of 119 packages of merchandise of various ownership, aggregating 35,285 pounds in weight, assembled by the complainant before delivery to the carrier. The bill of lading showed the Export Shipping Company as consignor and the Export Shipping Company, at 9 and 11 Broadway, New York, as consignee. On arrival of the goods in New York defendant refused to apply its car load rate to the shipment as an entirety, but assessed its car load rate against a part of the consignment and less than car load rates against the remainder. This resulted in the collection of a total charge of $149.60, or $44.74 in excess of the charges which would have been paid if the shipment had been treated as an entirety.

Complainant and interveners ask that the note to rule 5b and rule 15e be declared unlawful, because in violation of section 2 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3155]), and that reparation be awarded complainant in the amount of the excess charges collected through the enforcement of the note and rule aforesaid. These cases are governed in all respects by the decision just rendered in the case of California Commercial Association v. Wells, Fargo & Co., 14 Interst. Com. R. ——.

Our conclusions are as follows: The note to rule 5b and rule 15c of the Official Classification, as quoted above, are unjustly discriminatory, unjust, unfair, and unreasonable, in this: That they provide that defendants shall collect a greater compensation from certain persons for the transportation of property subject to the act to regulate commerce than defendants collect from other persons for doing for them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions. A carrier may not properly look beyond the transportation to the ownership of the shipment as a basis for determining the applicability of its rates. Complainant is entitled to reparation to an amount equal to the difference between the amount collected by defendants and the amount which would have been collected if each shipment had been treated as an entirety and the car load rate assessed in each case.

An order will be entered in accordance with these conclusions.

KNAPP, Chairman (dissenting). I cannot agree with the views of the majority in these cases, and am constrained to state, perhaps at undue length, the grounds of my dissent.

Complainant and interveners contend that the rules here challenged are in violation of section 2 of the act, and this contention presents the sole issue to be determined. The importance of this question, whether regarded from the standpoint of the railway, the shipper, the jobber, or the consumer, is obvious and far-reaching. The majority opinion merely refers to the conclusions announced in California Commercial Association v. Wells, Fargo & Co., supra, a case involving the so-called "quantity" rates of express companies. These cases cover the wider field of freight rates; and inasmuch as the order to be made involves in effect the abolition of a long-established practice and establishes a new rule of action for practically all carriers by railroad, as well as the defendants in these proceedings, I deem it proper, before proceeding to discuss the legal phases of the controversy, to state somewhat fully the facts and suggestions disclosed by the record.

The complainant and interveners are forwarding agents. At present there are a considerable number of individuals and corporations, located at large cities, engaged in the same business as complainant. The business of the forwarding agent, in so far as is material to the question involved, is to collect less than car load shipments from different consignors, combine such shipments into car loads and ship the same in the name of the forwarding agent, or of the owner of one of the less than car load shipments, to one consignee, who may be the forwarding agent himself, another forwarding agent at the point of destination with whom he has business relations, or the owner of part of the property transported. The consignee of the shipment, whoever he may be, receives the car load and distributes its contents to the parties for whom they are intended. The forwarding agent finds his compensation and profit in the difference between the car load and less than car load rates.

The saving effected by securing application of the car load rather than the less than car load rates may be divided between the forwarding agent and his customer in any agreed proportion. To the extent that the customer secures the carriage of his property at a lower rate than the less than car load rate, which would otherwise be applied, he saves money, and the division of the difference between the car load and the less than car load rates is a matter of private bargain between him and the agent. It is true that certain forwarding agents testified at the hearing that their charge for combining and forwarding shipments from Chicago to the Pacific Coast is 15 cents per 100 pounds, and that they uniformly maintain this charge. But it is apparent that they are under no legal obligation to make the same division with each customer, and that the commercial limitation upon their charge would be determined by their own advantage. Within this limit they can make any arrangement they may agree upon, with the result that each of two or more shippers, forwarding the same article between the same points in the same car, may pay a different amount for the transportation; that is to say, each will pay no more than the car load rate on the amount shipped plus the forwarding agent's charge, and the latter may vary as to each shipper.

The evidence discloses that the forwarding agency may be used in any man-

ner that will operate to effect a saving in freight rates. The individual shippers are not necessarily located at the same point, nor are the individual consignees. For instance, if a reduction in rates could be effected, a furniture dealer at Grand Rapids. Mich., having a shipment for a point in Maine, and a furniture dealer in Rockford, Ill., having a shipment for a point in Massachusetts, might forward their separate shipments at less than car load rates to Chicago. There the two shipments would be consolidated and forwarded at car load rates to Boston, and thence shipped again at less than car load rates from Boston to their respective destinations. The use of a forwarding agent may permit the less than car load shipper to reach markets from which he would be excluded by less than car load rates, provided he is so located that he can combine his shipments with others of like nature and can make contracts with the forwarding agent. On the other hand, the forwarding agent is free to contract as he desires, and it may happen, if a given shipper cannot be accommodated or does not agree as to terms, that he would be obliged to pay the less than car load rate upon a shipment sold or to be sold in competition with a similar less than car load shipment carried at a lower rate. Apparently it is within the power of the forwarding agent, at least where the less than car load rate is prohibitive, to determine, out of a class of shippers, who shall and who shall not be able to sell at a given destination.

Upon hearing it was urged by interveners that there are many reasons, aside from the saving in freight rates, which justify the existence of the forwarding agent. · It is claimed that goods are less likely to be damaged when loaded in one car going directly from point of origin to destination, and that generally less time is consumed in the transportation of a car load billed through than in the transportation of a less than car load shipment, which may be transferred from one car to another several times en route. Whatever the fact may be in this regard, the rules here in question do not prohibit a forwarding agent from giving his patrons whatever benefit may accrue from through shipment in one car, but merely provide that in case of such consolidation the less than car load rates shall be applied to the several shipments composing the car load.

Complainant and interveners suggested that enforcement of the rules here challenged is a matter of recent occurrence; but this was denied by defendants, and there is no proof to the contrary. Many tariff rules and regulations have been more rigidly observed since the amendment of the act in 1906, and the failure to apply these rules strictly and impartially in the past may have been one of the instances of laxity in transportation practices which formerly occurred. However, the cases of Lundquist v. G. T. W. Ry. Co. et al. (C. C.) 121 Fed. 915, decided in 1901, and Buckeye Buggy Company v. C., C., C. & St. L. Ry. Co. et al., 9 Interst. Com. R. 620, decided in 1903, indicate that in those years the railroads were attempting to enforce similar rules. Defendants say the note to rule·5b was established in compliance with the Commission's order in the Buckeye Buggy Company Case. However this may be, still the extent of the decision in that case was merely to require the allowance of car load ratings in cases where, upon delivery to the carrier, either the consignor or the consignee is the owner of the entire contents of the car. Whether the carrier may distinguish between the forwarding agent and the actual owner was not involved or decided.

The privilege sought by the forwarding agent of combining shipments of different ownership is entirely distinct from the privilege allowed to individual owners of combining and forwarding at car load rates shipments of different commodities. Generally speaking, where the latter privilege is allowed the former is denied, and vice versa. In Western Classification territory there is a distinct prohibition against the combination of two or more articles of single ownership having the same or different car load ratings, for the purpose of obtaining the car load rate, except as such combinations may be specifically authorized in the classification. In like manner there is no general warrant for such mixed car loads in the South, and the specific provisions in the Southern Classification for combined car loads are even more limited in number and extent of mixture than those authorized in the Western Classification. On the other hand, a rule of the Official Classification authorizes

the combination by the owner and carriage at car load rates of any two or more articles having the same car load rating, as well as the mixing of articles having different car load ratings; proper details being provided as to rates and minimum weights at which such combined shipments will be carried.

In this connection it is also to be observed that there is a radical difference in respect of the number of car load and less than car load ratings between the Western and Southern Classifications on the one hand and the Official Classification on the other. A recent careful and authoritative examination of the several classifications shows that in the Southern Classification there are 3,503 less than car load and only 773 car load ratings, the car load ratings being 22.1 per cent. of the less than car load: in the Western Classification there are 5,729 less than car load and only 1,690 car load ratings, the car load ratings being 29.8 per cent. of the less than car load; while in the Official Classification there are 5,852 less than car load ratings and 4,235 car load ratings, the car load ratings being 72.4 per cent. of the less than car load. In the Southern Classification 32.92 per cent. of the less than car load ratings are in the fifth, sixth, and lettered classes; in Western Classification there are no less than ——— car load ratings below fourth class, and in the Official Classification only 1.25 per cent. of the less than car load ratings are below fourth class. Of course, there are certain articles, such as coal, upon which no less than car load rate is named, and certain other articles upon which no car load rate is made, so that it does not follow that each article having a car load rating has also a less than car load rating, or vice versa; but, assuming that the articles of one class are offset by those of the other, it would follow that in Southern territory the forwarding agent could combine for the purpose of a car load rating only 22 per cent. of the articles having less than car load ratings; in Western territory only 29 per cent. of such articles; while in Official Classification territory 72 per cent. of such articles could be combined.

The natural reflex of these fundamental differences regarding the combination of shipments of single ownership is found in the rule respecting the combination of less than car load shipments of different owners. Where the former privilege is allowed, the latter is denied. This result is, perhaps, to be expected when considered from the standpoint of the carriers' revenue. In Official Classification territory, where the individual shipper can combine into mixed car loads and forward at car load rates practically all of his products, if there were added the privilege of the forwarding agent to combine and forward at car load rates the small shipments of different owners, it might happen that a large proportion of the traffic now carried at less than car load rates would be transported at car load rates and the carriers' gross revenue be reduced accordingly. On the other hand, in Western and Southern territory, where no such general privilege in respect of mixed car loads exists, and the forwarding agent is confined to the combination of a limited number of the same articles, such as two or more shipments of furniture or machinery, the effect upon the carriers' revenue is relatively unimportant.

Certain economic considerations are here suggested by the record in these cases. In our present state of industrial development the interchange of commodities involves two necessary factors—a person offering goods for shipment and a carrier transporting the goods so offered. The former finds his compensation in the production and sale of commodities: the latter, in their carriage. Generally, then, the cost of a commodity at the place of consumption will be the sum of the cost of production and the cost of transportation; and any additional cost must result from the presence of another factor, which is unnecessary, and from an economic standpoint unwarranted. The intervention of the middleman, in this case the forwarding agent, means another person who must make his living out of the transportation. In the last analysis the consuming public must support the carrier and the forwarding agent, in place of the carrier alone. Nor does it answer this to say that the forwarding agent actually decreases the aggregate expense, because the goods are carried to destination for less than would have been paid if the several shipments had been forwarded at the less than car load rates. The real significance of this contention is that the car load and less than car load

rates do not bear a proper relation to each other, if the forwarding agent can be supported and the shipper at the same time make a profit out of the difference between the rates. Obviously, the forwarding agent does not desire to do away with the present system of car load and less than car load rates, nor to reduce the difference between them, for the greater the difference the wider is his opportunity. His real object is, not to secure a readjustment of rates which shall more accurately measure the carriage of car loads and less than car loads, much less to remove the differences based upon quantity, but to secure the right to carry on a "bargain counter" business under existing conditions.

As we have seen, the Official Classification has nearly three times as many car load ratings as the Western, and more than four times as many as the Southern, and almost any combination of goods of the same ownership may enjoy the car load rate. Add to this unlimited privilege the right of the forwarding agent to combine shipments of diverse ownership and the undoubted result—the aggregate amount of traffic remaining the same—would be a large increase in car load shipments, with a corresponding decrease in the less than car load. That is to say, a considerable portion of the traffic now carried at less than car load rates would then be carried at car load rates, and it is evident that the gross revenue of the railroads would be seriously decreased. Whether their net revenue would be diminished depends upon a variety of considerations, but there is good reason to believe that it would be materially reduced.

Railroads are common carriers of both car load and less than car load freight. As such, they have provided facilities for less than car load shipments, including terminals in cities, freight houses, transfer platforms, clerical forces, and the like. Even if the forwarding agent and consolidator are allowed to do business, the railroads will still be obliged to handle a considerable amount of less than car load traffic, and consequently must maintain their present facilities and fixed expenses. The less than car load plant, so to speak, would have to be maintained on a diminished revenue. Whether the result would be increased less than car load rates or poorer service for less than car load shipments is, of course, a matter of speculation.

It does seem certain, however, that the advantages of car load rates could not be obtained by the large number of shippers who are located in small communities, where such agencies as the complainant's would not be available. To a certain extent such industries could perhaps send their shipments to the nearest center supporting a forwarding agency, and have them transported thence at car load rates; but at best the isolated shipper would be handicapped by the amount he would have to pay to reach a forwarder, and this disadvantage might drive him from the field. It seems fairly evident that the free use of the forwarding agent would operate to the injury of the smaller towns and tend strongly to the concentration of industries in the large cities. Indeed, witnesses for the interveners virtually admitted that the change sought by them might result in the ruin of manufacturers not located at commercial centers; but this they suggested would be merely another illustration of the "survival of the fittest." In other words, the transportation charge paid by a shipper on a given amount of less than car load traffic would not be determined by the service he sought from the carrier, but would depend upon whether he was so situated as to be able to combine with other shippers.

It also appears probable that the privilege for which complainant contends would be a serious disadvantage to the smaller jobbing towns and their wholesale houses. It must be remembered that nearly all purchases by retailers, except a few in the larger cities, are of less than car load quantities, and it is a matter of common knowledge that the extent of territory in which a jobber can do business is largely a matter of rates. The wholesaler at the smaller jobbing center finds his opportunity, to a great extent, in the fact that the car load rate from the primary market plus the less than car load rate to the town of the retailer is lower than the less than car load rate from the primary market to the same ultimate destination. Now, if the forwarding agent is entitled to the privilege claimed, he can take away this advantage of the interior jobber by making the rate from the primary market substantially the same as the car load rate to the jobber plus the less than car load

rate to the retailer. The cost of laying down the goods in the retailer's store is not reduced, and consequently there is no benefit to him or to the consumer; but the advantage of the jobber in respect of rates is taken away, and the forwarding agent becomes in effect the middleman.

Therefore, apart from all other considerations, it would seem that the privilege contended for by complainant involves the following results: (1) A saving in freight rates and an increased opportunity to reach distant markets on the part of the shipper who can use the forwarding agency to advantage; (2) a decrease in less than car load and an increase in car load traffic, with a probable net loss in the carriers' revenues, which might necessitate a reduction in less than car load service or an increase in less than car load rates; (3) serious injury to manufacturers in small towns, who could not use the forwarding agent; (4) the loss to wholesalers in the interior jobbing towns of the rate advantages they now enjoy, or at least a material reduction of those advantages, without benefit to the retailer or the consumer; (5) opportunity for discrimination between shippers, which would be criminal if indulged in by the carriers.

Whatever weight might be given to these matters, if the case depended merely upon the reasonableness of defendants' regulations, it is nevertheless earnestly contended that the regulations in question violate the arbitrary rule of law laid down in section 2 of the act, in that they result in different charges for like and contemporaneous service in the transportation of like kind of traffic under substantially similar circumstances and conditions. This contention calls for a careful consideration of the language of section 2 and its interpretation by the courts. For convenience, the section is quoted in full:

"Sec. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

The prerequisite to the application of the rule of this section is a finding of fact that the two kinds of traffic under comparison are like in kind, contemporaneous in movement, and carried between the same points under substantially similar circumstances and conditions. The real difficulty seems to lie in determining what considerations may be taken into account in deciding whether or not the circumstances and conditions of transportation are substantially similar. This leads to a review of the judicial decisions upon the subject, and particularly those relied upon by complainant.

It is insisted that section 2 of our act is virtually a re-enactment of section 90 of the English railway equality clauses acts, and that the English courts prior to the enactment of our statute had construed the English act to require the privilege to the forwarding agent (known in England as the "intercepting carrier") here asked by complainant. In support of this position, great weight is laid upon the decision in Great Western Ry. Co. v. Sutton, 4 Eng. & Irish App. 226, decided by the House of Lords in 1869, in an opinion by Lord Chelmsford, wherein the previous decisions bearing upon the right of the intercepting carrier in respect of freight rates were reviewed and analyzed. That the English decisions are entitled to great weight in arriving at the proper construction of our own act is not to be doubted, and this has frequently been asserted by the Supreme Court of the United States. I cannot agree, however, that the Sutton Case is in any sense controlling, because, as I read that decision, the facts upon which it rests are essentially different from those now under consideration.

In the first place, the Sutton Case was an action at law to recover back money paid by the intercepting carrier in alleged violation of the equality clauses. The question of fact as to whether the circumstances and conditions of carriage were substantially similar was submitted to a jury in the lower court, and the jury found for the plaintiff. In discussing the case, Mr. Justice

Blackburn said: "The next objection is that the circumstances are not the same. I do not think it can be said, as a matter of law, that they are the same; but I think the jury might, on the evidence, properly draw the conclusion that they were. I have already intimated to your lordships my opinion that the circumstances must be those relating to the carriage, not to the consignor, and that the fact that the plaintiff was a rival carrier does not in itself make a difference in the circumstances such as to justify a difference in the charge under the statute." In other words, if the jury had found for defendant, as the court intimated they might have done, and as the dissenting judge said they ought to have done, the decision would have been against the intercepting carrier. Whether the verdict of an English jury, which confessedly might have found either way, would be binding upon the Commission, is more than doubtful; but that is not the point which vitally affects the weight of the English decisions.

The real reason, as stated above, is that the facts upon which the intercepting carrier claimed relief were essentially different from the facts shown by this complainant. Briefly, the facts in the Sutton Case were these: The intercepting carrier combined packages into what were known as "packed parcels," weighing less than 500 pounds; each parcel containing packages from several consignors directed to several consignees. The railroad had a tariff providing that such combined shipments would be charged 50 per cent. above the rate applicable to a package of a similar size sent from one consignor to one consignee, and it enforced the higher charge against the intercepting carrier, but did not enforce it against other members of the public. This appears from the following language of Chief Justice Tindall, of the Court of Common Pleas, in Parker v. Great Western R. R. Co., 7 M. & G. 252: "The third head of claim arises out of an alleged difference in the charges made by the company to the public at large and to carriers for the conveyance of goods; such difference not being directed against any individual carrier, but against all carriers, as contradistinguished from individuals of the public at large. As to this difference the case states that, when one of the public has brought several packages of goods and paid the charges, the company have charged him on the weight of the aggregate, although they may have belonged to different consignees; also if several of the public have brought several packages addressed to one consignee, who was to pay the charges, such consignee has been charged upon the weight of the aggregate; but if a carrier has brought several packages consigned by or to different individuals, he has been charged upon the separate weight of each, unless it was known that more than one package belonged to the same sender and was going to the same consignee, in which case all belonging to the same sender and going to the same consignee were charged upon their aggregate weight; and in all such cases, where carriers were concerned, the company dealt with and recognized the carriers only as their consignor and consignee of the goods. The case further states that on all occasions when the company have carried goods for the plaintiff they have dealt with him only, and have refused to recognize any other person either as consignor or consignee. It appears to us, then, that the company are bound to treat the plaintiff as consignor and consignee for all purposes, including the mode of charging in the aggregate, and that they have no right to make a distinction in that respect between him and any other individual member of the public."

That the facts in the Sutton Case were substantially dissimilar is also shown by the following extract from the decision: "The plaintiff is a carrier in London, and his principal business is to collect parcels of goods for various wholesale houses, to pack them together in one parcel, and send the parcel so packed by the defendants' railway to his agents in the country, who unpack and distribute the inclosed parcels to different persons to whom they are addressed. The carmen of the plaintiff, who convey the parcels to the railway station, always take with them a printed form of declaration, with different headings, furnished by the defendants, among which are columns for the name and address of the consignee, the description of packages and contents, and at the foot of the declaration is a notice that 'all parcels of goods and packages, the contents of which are not properly declared by the senders, will be charged with the highest class, and all such parcels of goods and packages

not exceeding 500 pounds in weight, if the contents shall not be declared, will be considered as each containing different kinds of articles, and each such parcel of goods and package will accordingly be subject to the regulation relating to "smalls" and charged for accordingly.' Before the goods leave the plaintiffs' office he fills up the different columns of the declaration, except those headed, respectively, 'Weight,' 'Paid,' and 'Remarks,' and every parcel containing several parcels of different kinds of goods is always described by plaintiff as 'packed.' The defendants charge for the carriage of goods according to their nature and description by a tariff headed 'Rates from London,' 'on goods and parcels above 1 cwt. and under 500 lbs. by luggage trains,' containing five columns of increasing rates of charge and a column headed 'Class —Packed Parcels,' stating the charge for them to be '42s. 6d.' (being the charge at the fifth or highest rate), 'and 50 per cent.' All the packed parcels carried for the plaintiff were charged at this rate, which, looking to the plaintiff's parcels only, would be a correct charge. But the ground of the plaintiff's action against the defendants is that they have been in the habit of charging the packed parcels of other persons carried by their railway at a lower rate than they charged the packed parcels of the plaintiff, which, he contends, by their acts of Parliament they have no right to do. For the purpose of proving this difference of charge the plaintiff produced the evidence (which was excepted to) of certain wholesale warehousemen and drapers in London who were in the habit of inclosing in one package or hamper various descriptions of goods, not only for their own customers, but also for the customers of other houses; and he proved that the defendants always charged for the carriage of their packed parcels at the fourth-class rate in the tariff, being the rate appropriated to drapery goods, and never charged the extra rate of 50 per cent. on any of their packages. One witness (the clerk of Messrs. Morley, warehousemen) stated that the defendants were perfectly aware of the practice of the houses as to packed parcels, but that they could not tell from the outside of any particular parcel whether it was packed or not. The plaintiff also gave evidence (which was excepted to) that in the year 1849, upon an arbitration between another carrier and the defendants, witnesses proved, in the presence of the defendants, their solicitor, and traffic manager, the practice of houses in London of packing parcels together containing the goods of various persons and sending them by the defendants' railway, and that the practice of packing parcels had been for the last 40 years so general as to be notorious among carriers. Upon this evidence the learned judge directed the jurymen that there was evidence upon which they might find that parcels had been carried by the defendants for other persons containing goods of a 'like description and under like circumstances' at a less rate than such goods were carried by them for the plaintiff, and also upon which they might find that the defendants knowingly and purposely charged the plaintiff more than other persons. And upon this direction the jury found a verdict for the plaintiff."

In other words, the Sutton Case would be analogous to a case in this country where a forwarding agent, who had consolidated several shipments of different ownership and for different consignees, was charged a higher freight rate than other persons for whom similar consolidated shipments were carried. But the defendant railroads provide the same rate for all consolidated car loads, namely, the less than car load rate on the various packages. This practice was not held to be a violation of law in the Sutton Case. In fact, it seems by inference to be approved, when the court says: "All the packed parcels carried for the plaintiff were charged at this rate, which, looking to the plaintiff's parcels only, would be a correct charge." The language quoted seems fairly to convey the idea that a higher charge might properly be made for a packed or consolidated parcel than for a single parcel of similar size. So that, if my understanding of the Sutton and prior cases is correct, they really favor defendants' present rules.

Moreover, there are radical differences between the historical relation of the intercepting carrier to the English railway and that of the forwarding agent to the American railway. In England the forwarding agent is a carrier; in the United States he is not. Several other distinctions are pointed out by the Circuit Court of Appeals in Detroit, G. H. & M. Ry. Co. v. I. C. C.,

74 Fed. 803, 809, 21 C. C. A. 103. "At first, in England, if not here, the conception of a railroad was that it was, like the King's highway, open to all who wished to go upon it for the transportation of goods along its lines, and the earliest acts authorizing their construction, proceeding upon this theory and the rules contained in the legislation for the regulation of the 'tolls,' 'tonnage,' 'rates,' and 'charges,' were based upon that conception of their use. The idea that the railroad owner should be himself a carrier of goods was at first almost wanting in the legislation concerning railroads. Very soon, in the process of evolution, he was authorized to become a carrier, others having the right, however, to share that business with him; the railroad owner most conveniently furnishing the motor power, whether of engines or other kinds, the trucks and carriages, just as he furnished the roadbed and lines of rails, and this whether ne himself or some other contractor was the carrier of the goods. But the business of carriage was at first almost exclusively in the hands of other contractors than railroad owners, they occupying a relation to the lines of railway very much like that which in our day the express companies in this country bear to them, only the business of these 'carriers' was much more extensive, embracing all goods, as well as small parcels for quick delivery. Paying the railroad company its 'tonnage,' 'rates,' 'tolls,' and 'charges' for the use of the road, these outside carriers depended largely, if not wholly, for their profits upon compensation for the accessorial service of collection and delivery, including particularly the cartage of the goods. Naturally they charged a lump sum to their customers, which covered the compensation for their own accessorial service and the charges which they paid to the railroad company, there being no separation or distinction between the two, any more than in the old-fashioned land carriage, as far as the shipper was concerned, but in the settlement between the railroad company and the 'carrier' the distinction appeared."

We may now proceed to examine the other American decisions in an attempt to ascertain what facts may be considered in determining whether or not the circumstances of carriage are similar, and perhaps a chronological review of the leading authorities will be the most convenient.

The first important case construing section 2 is that of the Circuit Court in Interstate Commerce Commission v. B. & O. R. R. Co., 43 Fed. 37, decided in 1890. The Commission had ruled that the sale at reduced rates of a party rate ticket for the transportation of ten or more persons unjustly discriminated against other passengers. This ruling was disapproved by the Circuit Court in an opinion containing the following comment upon this section: "Again, the testimony establishes that party rate tickets secure patronage that yields large revenues to the respondent, and that the withdrawal of those tickets would almost entirely destroy that patronage, for it appears that the rate is as high as can be made without putting it beyond the reach of those who are the main purchasers. Are all these considerations to be left out of the account in determining whether there has been 'like and contemporaneous service' 'under substantially similar circumstances and conditions'? Does it depend solely upon whether party rate passengers and those holding single tickets occupy the same cars, have the same accommodations, and are traveling from the same point to the same destination? Is that the full meaning of 'similar circumstances and conditions'? The answer—which the question itself seems to suggest—is that the phrase has a much larger and more comprehensive meaning, else Congress could not consistently have recognized mileage, or excursion, or commutation tickets, for all these trespass upon the narrow ground on which the contrary view rests. To give the act its proper interpretation, the phrase must be held to include circumstances and conditions affecting the business interests of the carrier and of its patrons, or, in other words, circumstances and conditions of a commercial character, which, while they should not exclude or override the consideration of what is just and reasonably advantageous to those not so situated as to be able to avail themselves of reductions offered to the general public, should be so recognized as not to be prejudicial or unjust to any, and yet, upon the whole, to promote the interest of all concerned in the beneficial operation of the act."

The Supreme Court of the United States affirmed the decision of the Circuit Court in 1891. 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 699. While the foregoing expression of the Circuit Court was not commented upon, the Supreme Court seems in substance to hold that even under section 2 some consideration may be given to the business interest of the carrier and other matters which, although intimately related to the matter of carriage, occur either before the traffic is offered to the carrier or after its delivery at destination. Referring to section 22, the court says: "It may even admit of serious doubt whether, if the mileage, excursion, or commutation tickets had not been mentioned at all in this section, they would have fallen within the prohibition of sections 2 and 3. In other words, whether the allowance of a reduced rate to persons agreeing to travel 1,000 miles, or to go and return by the same road, is a 'like and contemporaneous service under substantially similar conditions and circumstances' as is rendered to a person who travels upon an ordinary single trip ticket. If it be so, then, under state laws forbidding unjust discriminations, every such ticket issued between points within the same state must be illegal."

In 1896 the Supreme Court decided the case of T. & P. Ry. Co. v. I. C. C., 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940, commonly known as the "Import Rate Case." Without going into the facts of this case, it is sufficient to quote what is therein said of the meaning of section 2. The language of the court is as follows: "The principal purpose of the second section is to prevent unjust discrimination between shippers. It implies that, in deciding whether differences in charges, in given cases, were or were not unjust, there must be a consideration of the several questions whether the services rendered were 'like and contemporaneous,' whether the kinds of traffic were 'like,' whether the transportation was effected under 'substantially similar circumstances and conditions.' To answer such questions in any case coming before the Commission requires an investigation into the facts; and we think that Congress must have intended that whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered in forming a judgment whether such differences were or were not 'unjust.' Some charges might be unjust to shippers; others might be unjust to the carriers. The rights and interests of both must, under the terms of the act, be regarded by the Commission." It may be observed that Mr. Justice Harlan, in his dissenting opinion, contended that the fact that one shipment originated in Europe and the other in New Orleans was not a fact which would render dissimilar the transportation of the two classes of freight from New Orleans to San Francisco; but the majority of the court apparently did not agree to this proposition.

The case of Wight v. U. S., 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, decided early in 1897, turned directly upon the application and meaning of the words "circumstances and conditions" as used in section 2. This case is discussed at length by interveners and defendants, and should be carefully analyzed, in order that its meaning may not be misconstrued. These facts appeared: One Breuning, a dealer in beer at Pittsburg, had a warehouse adjoining the track of the Pan Handle road, and beer shipped by that line from Cincinnati was delivered directly into his warehouse at the tariff rate of 15 cents. The warehouses of his competitors at Pittsburg were not located upon either the Pan Handle or the Baltimore & Ohio roads, and beer transported from Cincinnati to Pittsburg for these competitors by either line had to be carted from the station to their warehouses. The rate by both lines being 15 cents, it was, of course, to Breuning's interest to ship by the Pan Handle, as he would thereby obtain delivery into his warehouse and save cartage charges. For the purpose of obtaining a part of Breuning's business, the Baltimore & Ohio allowed him the cost of carting beer from its station in Pittsburg to his warehouse upon the Pan Handle tracks, and the question before the court was whether such allowance violated section 2. In disposing of the case Mr. Justice Brewer used the following language: "Whatever the Baltimore & Ohio Company might lawfully do to draw business from a competing line, whatever inducements it might offer to the customers of that competing line to induce them to change their carrier, is not a question involved in this case. The wrong prohibited by the section is a discrimina-

tion between shippers. It was designed to compel every carrier to give equal rights to all shippers over its own road, and to forbid it by any device to enforce higher charges against one than another. * * * And section 6 of the act, as amended in 1889, throws light upon the intent of the statute, for it requires the common carrier, in publishing schedules, to 'state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges.' It was the purpose of the section to enforce equality between shippers, and it prohibits any rebate or other device by which two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor. It may be that the phrase 'under substantially similar circumstances and conditions,' found in section 4 of the act, and where the matter of the long and short haul is considered, may have a broader meaning or a wider reach than the same phrase found in section 2. It will be time enough to determine that question when it is presented. For this case it is enough to hold that that phrase, as found in section 2, refers to the matter of carriage, and does not include competition." It will thus be seen that the court held in this case that the words "circumstances and conditions," as used in section 2, refer to the matter of carriage by the line transporting the traffic, and not to the circumstances and conditions of carriage on a competing line. The court did not define the meaning of the term "matter of carriage," and it seems, therefore, proper to seek the true meaning of that term in the earlier decisions which have been noted.

United States v. Chicago & Northwestern Ry. Co., 127 Fed. 785, 62 C. C. A. 465, decided by the Circuit Court of Appeals in 1904, involved the right of the United States government to claim the benefit of defendant's party rates for the transportation of soldiers. The court held that the government was not entitled to the party rate, assigning as reasons which constitute dissimilarity in the circumstances and conditions of carriage between the ordinary party using the party rate ticket and the government's soldiers, the following: "(1) The party rate ticket is limited, whereas the government requires a ticket of unlimited service. (2) The government does not pay in advance for its ticket, but only settles after a considerable period of time, and often after much annoyance and inconvenience, and sometimes actual deduction. (3) Many amusement companies and similar organizations could not travel if obliged to pay the regular rate of fare. The giving of these reduced fares stimulates this kind of business and adds to the revenues of the railways, without any corresponding increase in the cost of operation. (4) While these tickets are only sold from point to point on the line of a particular railway, it is reasonably certain that the company will buy more than the one ticket in going from place to place. (5) The traveling of amusement companies stimulates other kinds of travel. The performance of a great singer at some point upon the line of railway might induce hundreds of other persons to buy tickets to the same point, while the movement of ten soldiers would have no such effect. (6) The government is not in any way in competition with any other members of the public in the movement of its troops, and hence there can be no unjust discrimination."

Whether all of the reasons assigned could properly be considered by the court, in view of the decision in the Wight Case, was seriously questioned by the majority of this Commission in its opinion in the Matter of Party Rate Tickets, 12 Interst. Com. R. 95, decided April 8, 1907; but the fact remains that the United States Circuit Court of Appeals, composed of Judges Grosscup, Baker, and Bunn, did consider the facts mentioned as constituting dissimilarity of circumstances and conditions, and this in a decision rendered seven years after the decision in the Wight Case. Certainly the reasonable inference is that the Circuit Court of Appeals was of opinion that the reasons stated came within the term "matter of carriage," as used in the Wight Case, as being conditions precedent or subsequent so intimately and indissolubly connected with the carriage, and so reacting upon the carrier as a result of the carriage, as fairly to come within the phrase "matter of carriage."

It is suggested that defendants' rules are such that it may examine into the ownership of property offered for transportation, and that to sanction

the rules in question is to hold that a carrier may make a difference in rates depending upon the person who offers it for transportation; that the rate made must apply to the shipment, not to the shipper. But these suggestions do not go to the point in dispute. Of course it is not lawful to allow a difference in rate for the same service because one shipper is a farmer and another a physician, or to apply one rate upon a shipment where absolute ownership vests in the shipper and another rate upon a similar shipment where the shipper is merely a bailee. But the case here presented involves a fundamentally different question, namely, whether a carrier, under section 2, may make one rate for a consolidated car load—made up of packages intended for various consignees at destination—and a different rate for a car load of like traffic intended for delivery to a single consignee. Is there such similarity between the two classes of traffic "in the matter of carriage" as will bring the carrier within the operation of the second section? It is not necessary to make any finding concerning the reasonableness of the difference in charges, for if substantial similarity be found unreasonableness will be presumed, while if substantial dissimilarity be found reasonableness will be presumed, so far as the second section is concerned. In other words, when substantial dissimilarity is shown the nonviolation of section 2 is established.

The English cases, as I conceive, did not involve the question now before us, but only decided that the same rate must be applied to all consolidated shipments, or packed parcels, regardless of the business occupation of the shipper. The only case in this country directly in point is the case of Lundquist v. G. T. W. Ry. Co. et al. (C. C.) 121 Fed. 915, wherein the court denied the claim of the forwarding agent mainly upon the ground that the liability of the carrier to a greater number of suits in case of damage to a car load owned by several persons created such a dissimilarity of circumstances and conditions as would avoid the operation of the second section. It is true that this basis for the decision has been more or less criticised. In the Buckeye Buggy Company Case, supra, we expressed the opinion that, although there may be weighty reasons why rules against forwarding agents can and should be adopted, liability to a greater number of suits is not a matter of practical importance. Nevertheless the Lundquist Case decided the precise question and is an authority not to be lightly disregarded.

It seems clear that the exceptions to section 2 expressly enumerated in the twenty-second section, the decisions of the courts, and the rulings of this Commission tend strongly to show that within certain limits the business interest of the carrier and the direct result of the transportation upon the revenues of the carrier may operate to create dissimilarity in the matter of carriage sufficient to avoid the operation of the second section. In the Party Rate Case the Supreme Court said that it may admit of serious doubt whether, if mileage, excursion, or commutation tickets had not been mentioned at all in section 22, they would have fallen within the prohibition of section 2; whether the allowance of a reduced rate to persons agreeing to travel 100 miles, or to go and return by the same road, "is a like and contemporaneous service under substantially similar conditions and circumstances" to that rendered to persons who travel upon ordinary single trip tickets.

The only difference between the single trip and the excursion ticket passenger between the same points is that the excursion passenger agrees to return by the same or some designated route, while the single trip passenger may never return, or may return by a different route. Although there is no difference, so far as the physical transportation is concerned, there is a difference in the amount of traffic and revenue secured to the carrier. Whatever may be said of the weakness of this argument, because such tickets are excepted by the statute itself, does not apply to the party rate ticket, which is not mentioned in the statute, but is sanctioned by the Supreme Court under section 2. That decision might have been rendered verbatim as well after the Wight Case as before, since the party rate ticket is not justified by the competition of rival carriers, but upon the ground of the business interest of the carrier hauling the traffic. Says the court: "If these tickets were withdrawn, the defendant road would lose a large amount of travel, and the single trip passenger would gain absolutely nothing."

Plainly there is no substantial physical difference in the transportation, be-

tween two given points, of 10 persons who have combined themselves into a party and purchased a party ticket and of 10 individuals who have not combined themselves into a party. The operation of section 2 is avoided by the party rate, not by reason of physical differences in the transportation, but by reason of increased traffic and revenue secured to the carrier. This case, read in connection with the Wight Case, throws light upon what constitutes "the matter of carriage," and gives to section 2 a broader construction than is contended for by complainant. It may be added that any other holding would be inconsistent with the ruling of the Commission (Tariff Circular No. 15a, p. 61, rule 53) which recognizes the right of carriers to issue excursion tickets and to limit their use to members of a particular association or society or to delegates to a particular convention. This ruling, it is to be noted, has been reissued since the Commission's decision of April, 1907, in the matter of party rate tickets.

The Commission has also impliedly approved tariffs which provide a half rate upon machinery returned to a factory for repairs and ordered reparation upon the basis of such a tariff. Minneapolis Threshing Machine Company v. C., R. I. & P. Ry. Co., 13 Interst. Com. R. 128. No such tariff can be legal if, in determining whether or not one shipment as compared with another is transported under substantially similar circumstances and conditions, the carriers and the Commission may not consider what happened before the traffic was offered for transportation at the point of origin or after it was delivered by the carrier at point of destination. If two pieces of machinery are sent to a factory for repairs, one of which originally came from the factory to which it is returned and the other from a different factory, it will hardly be contended that there is any difference in the physical carriage of the two shipments. The only distinction is that one of the shipments was originally carried out from the factory over the railroad by which it is returned. The difference in rate is justified, if at all, by a condition precedent to the offer of the shipment to the carrier for transportation to the factory. In like manner it would seem that proportional rates, special import and export rates, and other similar differences in rates, can be justified by the carrier making them only upon the basis of conditions precedent or subsequent to the particular carriage for which the lower rate is made. It would be extremely difficult, for example, to explain upon any other theory the lawfulness of a milling in transit rate from the milling point to final destination.

To sum up the decisions under section 2, we find in the Wight Case that competition of a rival carrier is not a differentiating circumstance; that the section must be construed in conformity with section 6 and other substantive portions of the law. Under the Party Rate Case the fair business interest of the carrier may be considered as creating dissimilarity, subject to the general prohibitions of the act against unreasonableness of charges and unjust discrimination; and this seems to leave almost unqualified the statement of the Supreme Court respecting the section in the Import Rate Case: "We think that Congress must have intended that whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered in forming a judgment whether such differences were or were not unjust." This does not in the least offend the principle of the Wight Case, wherein it is announced that under section 2 consideration may be given only to the "circumstances" and "matter of carriage," for the Supreme Court has not defined the meaning and scope of the "circumstances" and "matter of carriage," otherwise than in the decisions prior to the Wight Case, of which mention has been made.

Accepting the forwarding agent in the capacity in which he asks consideration as a shipper, I hold that there is such substantial dissimilarity of circumstances and conditions relating to the matter of carriage that the rule of the second section does not apply. The Supreme Court has held that where the circumstances and conditions of the particular carriage are such as to produce increased traffic and revenue to the line, as in the carriage of persons on party rate tickets, such circumstances and conditions will justify the carrier in making a lower rate for a party than for persons who do not form a party; and if such circumstances may be considered when they

operate to increase the carrier's business, it certainly seems proper to consider the circumstances of a carriage which reduces the carrier's revenue.

The railroad is a carrier of both car load and less than car load freight. It is under legal obligation to furnish cars, engines, warehouses, truckmen, and clerks for the handling of less than car load traffic. Being under this obligation, it is difficult to see how the carrier can be forced, against its will, to allow a third party to come in and assemble and distribute its package freight and take the revenue which accrues from that service. If the forwarding agent may intervene in the transaction and perform the work of collection in cars and of distribution at the end of the carriage to the real consignees, it is evident that the operation diverts from the carrier to the forwarding agent whatever profit there may be in the accessorial service of loading, unloading, and billing, and materially reduces the revenue which is properly applicable to the maintenance of the carrier's less than car load plant. In the United States it would not be contended that the forwarding agent could require the carrier to give him the use of its tracks for the transportation of freight in the forwarder's vehicles; and it would seem that the carrier, being under the legal obligation to perform the carriage, may also lawfully claim the right to perform the incidental, but really integral, part of the carriage, to wit, the consolidation of package freight into cars, and that the withdrawal of this service from the carrier constitutes a substantial difference in the matter of carriage.

The consolidation of an occasional car load of package freight and its carriage at car load rates would not appreciably affect the revenues of a carrier. But under the conditions existing in Official Classification territory, where there is a car load rating for practically every article of commerce, and an almost unlimited privilege of carriage at car load rates of different articles sent by one shipper to one consignee, it cannot be doubted that the change asked by complainant would materially diminish the carrier's revenue. If 1 per cent. of a carrier's traffic were changed from the less than car load to the car load class, the result would be unimportant; but if, with no change in the aggregate volume of traffic, 50 per cent., or even 20 per cent., of its traffic were so transferred, the carrier's revenue might be so seriously reduced as to force an entire readjustment of its freight schedules. I am of opinion that these are matters of carriage which create substantially dissimilar circumstances and conditions and avoid the operation of the rule of section 2, more especially as no discrimination results against the real shipper of the goods.

It is not asserted that all the circumstances mentioned in the foregoing statement of the evidence may be considered as creating dissimilarity under section 2; but I am convinced that, for the purposes of this case, it is proper to take into account such facts as directly affect the business interest of the carrier, the interests of its less than car load patrons, who cannot use the forwarding agency, the somewhat increased liability of the carrier in case of loss or damage to the goods, and the fact that the forwarding agent undertakes to render a service for which the carrier has provided facilities, and to perform against the carrier's will an integral part of the carriage of small shipments. Moreover, the right of the carrier to make a car load rate and a higher less than car load rate is well established. To say that a carrier has the right to provide car load and less than car load rates, and yet can be compelled to allow car load rates on less than car load shipments when combined by a forwarder or other agent, that the principal shall be denied what his agent can demand, is to advance a proposition which seems, not only without support in the law, but at variance with its provisions.

It is not only the right, but the duty, of the Commission to look through the form to the substance of a transaction. Courts and witnesses may sometimes be estopped in actions at law from considering or showing the real merits of a case by strict rules of evidence or pleading. But any such restriction upon the Commission would be against public policy, inasmuch as our decisions affect the shipping public and the carriers of the country generally, as well as the parties to a particular case. It is one of the best-known and most universal rules of equity that the rights of the party having the beneficial interest, rather than the party holding the mere legal title, shall be considered and enforced.

166 F.—33

Applying this principle to the present case, the real parties in interest are the carrier and the persons who desire to secure the transportation of less than car load freight. So long as each less than car load shipper is charged the published less than car load rate, either directly or through the agent whom he employs to ship his freight, he certainly can make no claim of unjust discrimination under the most ironclad construction of section 2. Viewed in this light, the elaborate argument of the forwarding agent fails to be in any degree convincing. He appears merely as a scalper of freight rates, a person who makes his living out of a scheme and device whereby his patrons secure transportation of less than car load shipments at rates less than those offered by the carriers' public tariff. Indeed, it seems pertinent to inquire whether, if complainant's contention is correct, the publicity requirements of the act in respect of rates would not be virtually defeated. Clearly the less than car load rates would not be those named in published tariffs, but such as might be agreed upon between the forwarding agent and the shipper; and if the rates actually secured by less than car load shippers through the intervention of the forwarding agent are just and lawful, why should not the carrier be permitted to effect the same result by direct bargaining with the shipper? Can the same thing be lawful when done by the forwarder and a punishable offense when done by the carrier?

I do not concede that the forwarding agent is the real shipper, nor is he a cartman. The cartman performs his service and charges for it. That is the whole transaction. Neither he nor his charge has any relation to the railroad or to railroad rates. But the forwarding agent exists by and through his relations to railroad rates. His opportunity to do business depends upon his ability to secure the transportation of a given article cheaper than the charges for its carriage if offered directly by the actual shipper, who is his client. The evidence before us shows that the general practice of the forwarding agent is to render a bill to the real shipper, showing separately the items of cartage and freight, and this is confirmed by the statement of intervener's counsel at the hearing:

"Mr. Slusser: You do understand that it is your company that pays the freight rates on less than car load shipments, that you pay according to your weight a proportionate share of the freight rate from the point of origin to the point of destination, and that you simply pay the forwarding agent as a forwarder for shipping the goods."

This view is supported by such judicial definitions as I am able to find of the word "forwarder":

"A forwarder is one who, for compensation, takes charge of goods intrusted or directed to him, and forwards them; that is, puts them on their way to their place of destination by the ordinary and usual means of conveyance, or according to the instructions he receives. Where he has a warehouse for the reception and safe-keeping of the goods until they can be forwarded, he unites the twofold occupation of warehouseman and forwarder. His occupation is further distinguished from that of the carrier by the circumstance that he has no interest in and receives no part of the compensation that is paid for the carriage and due delivery of the goods. An express company, which holds out to the public that it will take goods or parcels to be delivered at certain points or places, and which receives a compensation for the carriage and delivery, is a common carrier, and not a forwarder." Place v. Union Ex. Co. (N. Y.) 2 Hilt. 19, 25.

"A forwarder of merchandise, who maintains a warehouse for the receipt of goods and forwards them therefrom by common carriers to such destination, is not a common carrier, nor liable as such." Roberts v. Turner (N. Y.) 12 Johns. 232, 7 Am. Dec. 311.

"A forwarder is a person who receives and forwards goods, taking on himself the expense of transportation, for which he receives a compensation from the owners, but who has no concern in the vessels or wagons by which they are transported, and no interest in the freight." Schloss v. Wood, 17 Pac. 910, 11 Colo. 287.

In the light of these definitions it is seen that the forwarding agent, as he appears in the present case, is quite different from the agent whose activities have been described in the foregoing decisions. He has no interest in

the freight, but he has a decided interest in the freight rate. In the last analysis he is not paid by the real shipper of the goods for his services, but divides with such shipper the difference between car load and less than car load rates. If there were no difference between the two rates, his occupation would be gone.

Looking at the substance of the transaction, it is apparent that the real shipper—the person who furnishes the goods, desires their transportation, and pays the freight rate—can make no allegation of discrimination, unjust or otherwise, for he is charged precisely the same amount as any other shipper of the same amount of like traffic between the same points. If the real shipper cannot complain, it is difficult to see on what theory his agent can do so. Holding, as I believe we should, that when the forwarding agent collects traffic from various owners and forwards it to various consignees he is not a shipper, but merely a forwarder, it follows that he has no just complaint so long as he is allowed the same rates as other forwarders; but no question of discrimination between forwarders is here presented. Moreover, the Supreme Court seems to have decided in the Wight Case that the rule of section 2 applies only to shippers. Speaking of this section the court says: "The wrong prohibited by the section is a discrimination between shippers. It was designed to compel every carrier to give equal rights to all shippers over its own road and to forbid it by any device to enforce higher charges against one than another." This language tends strongly to support the idea that the section prohibits discriminations between shippers, not between physical car loads of freight, and that so long as shippers are given equal rates for similar services no violation of the section occurs.

In order that the views herein expressed may not be misapprehended, I add a summary of my conclusions and a brief statement regarding their application. The question whether circumstances and conditions are substantially similar, within the meaning of the second section, is a question of fact, to be determined in each case as it arises. In determining this question of fact the Commission is not confined to the physical act or incidents of transportation, but may within limits take into account matters affecting the interest of carriers and the public which occur before the traffic is offered for carriage or after its delivery at destination. Upon the record in these cases, and for the reasons above stated, I find as a matter of fact that car load traffic offered by a forwarding agent or other person acting in a similar capacity, and consisting of less than car load shipments of diverse ownership, is not transported under substantially similar circumstances and conditions as compared with like car load traffic of single ownership; and from this finding it follows as a conclusion of law that the refusal of car load rates to such forwarding agent or other person is not "unjust discrimination" as that term is used in the second section. In other words, where the circumstances and conditions are in fact substantially dissimilar the carrier has the legal right, if it chooses to do so, to make a reasonable difference in rates. It is for this reason that the denial of car load rates to the forwarder is not unlawful.

But, while substantial dissimilarity carries the right to make a difference in charges, it obviously does not compel a difference. The circumstances and conditions may be distinctly unlike, and yet the rates properly the same. For example, the law does not require car load and less than car load rates on any commodity. It permits the carrier to apply a uniform rate, if it be reasonable, without regard to quantity. Therefore the allowance of car load rates on combined less than car load shipments of diverse ownership, although it cannot be compelled, is nevertheless not unlawful—indeed, may be commendable—if no undue preference results to the less than car load shipper receiving such allowance. Whether undue preference does result in a particular case is a question of fact, to be determined in an appropriate proceeding. The carrier is free to exercise its discretion in this regard, subject to the prohibition against unreasonable and discriminatory charges.

Under the conditions prevailing in some sections of the country, notably in Western and Southern Classification territories, as outlined above, the car load rates accorded on consolidated shipments may be entirely proper and lawful. There is certainly no presumption that they operate with discriminating effect

or are otherwise illegal. So, too, there are certain commodities, such as fruits and vegetables, for instance, which are largely produced in less than car load quantities, but which could not be marketed as they mature on the less than car load rates now established. To accommodate this traffic, which is often and perhaps generally handled by associations of growers, the carriers frequently allow car load rates on the combined shipments of different, owners. I perceive nothing unlawful in this practice. On the contrary, it seems to be advantageous both to the carriers and the shippers. In short, there appears to be a legitimate field within which carriers may with propriety allow car load rates on shipments of diverse ownership. Under proper restrictions, and in accordance with suitable and definite provisions in tariffs or classifications, there can be no valid objection, so far as I am aware, to the allowance of this privilege, provided it does not operate with discriminating effect.

But that is not at all the issue involved in these cases. It is one thing to say that carriers may in certain cases and under certain conditions allow car load rates on consolidated shipments. It is quite another thing to say that they must do so in all cases and under all conditions. This is the precise point in dispute, and I am constrained to decide it againt the complainant. I do not undertake to say to what extent or under what circumstances a carrier may lawfully accord car load rates on shipments of diverse ownership, for no such question is here presented. I merely hold that no carrier can be compelled to allow car load rates on such shipments because the circumstances and conditions of carriage are substantially dissimilar within the meaning of the second section. In my judgment, the forwarding agent, the commission dealer in freight rates, who seeks to buy transportation at wholesale and sell it at retail on his own terms, is not entitled to the order sought in these proceedings.

These considerations lead to the conclusion that the rules in question do not violate the second section of the act, and are therefore not unlawful.

I am authorized to say that Commissioner HARLAN unites in this dissent.

Wm. S. Jenney and Douglas Swift, for complainants.

Henry L. Stimson and P. J. Farrell, Sol., for Interstate Commerce Commission.

Before LACOMBE and WARD, Circuit Judges, and MARTIN, District Judge.

PER CURIAM. A majority of the court is in accord with the reasoning and conclusions expressed in the dissenting opinion of the Chairman of the Commission, and do not think it necessary to add anything to his exhaustive discussion of the questions presented.

An injunction will be granted, suspending the operation of the order of June 22, 1908. Inasmuch as both sides upon the oral argument agreed that the facts were fully presented, this application may, if all parties consent, be turned into a submission on final hearing and disposed of accordingly.